# Supreme Court of Texas

---

No. 20-0567

---

Terrance J. Hlavinka, Kenneth Hlavinka, Tres Bayou Farms, LP,
and Terrance Hlavinka Cattle Company,

*Petitioners,*

v.

HSC Pipeline Partnership, LLC,

*Respondent*

---

On Petition for Review from the
Court of Appeals for the First District of Texas

---

**Argued February 23, 2022**

JUSTICE BLAND delivered the opinion of the Court.

Recognizing the important role that pipeline development plays in meeting our state's manufacturing and energy needs, the Legislature grants common carriers the right to condemn private property for the construction of pipelines that transport certain products.[1]  The Texas

---

[1] *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC* (*Tex. Rice I*), 363 S.W.3d 192, 204 (Tex. 2012); Tex. Nat. Res. Code § 111.002(1) (granting common-carrier status to pipeline owners or managers when the

Constitution, however, limits the exercise of this eminent domain power to purposes that serve a "public use."[2]

In this eminent domain dispute, we decide whether a pipeline company has demonstrated common-carrier status with eminent domain authority to condemn an easement and construct a pipeline that transports polymer-grade propylene. If so, we decide whether a landowner may testify to recent, arms' length sales of pipeline easements as evidence of the market value for such an easement across his property.

The landowner in this case challenges the pipeline company's right to condemn, contending that transport of polymer-grade propylene does not grant the pipeline company common-carrier status, and that the company's transport to an unaffiliated customer is insufficient to demonstrate that such transport is for public use. The pipeline company, in turn, seeks to exclude past sales of pipeline easements

---

pipeline transports crude petroleum "to or for the public for hire"); Tex. Bus. Orgs. Code § 2.105 ("In addition to the powers provided by the other sections of this subchapter . . . entities engaged as a common carrier in the pipeline business for the purpose of transporting oil, oil products, gas, carbon dioxide, salt brine, fuller's earth, sand, clay, liquefied minerals, or other mineral solutions ha[ve] all the rights and powers conferred on a common carrier by Sections 111.019-111.022, Natural Resources Code."); *see also* Tex. Nat. Res. Code § 111.019(a) (conferring right of eminent domain).

[2] Tex. Const. art. I, § 17(a)–(b) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . . '[P]ublic use' does not include the taking of property . . . for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues."); *see also Tex. Rice I*, 363 S.W.3d at 194–95 (noting that the Texas Constitution's public-use requirement safeguards private property rights).

across the property as evidence of the value of the easement that the pipeline company seeks to condemn.

The trial court agreed with the pipeline company on all fronts, concluding that the company possessed common-carrier eminent domain authority, that it had established that its pipeline transport was for public use, and that the landowner was limited to testifying about the agricultural value of the property in proving the market value of the property taken. The trial court thus excluded the landowner's evidence of sales of other pipeline easements. The court of appeals agreed with the trial court that a pipeline transporting polymer-grade propylene is eligible for common-carrier status with eminent domain authority.[3] It determined, however, that whether the pipeline serves a public use presented a fact question for a jury to resolve.[4] Finally, the court of appeals held that the trial court erred in excluding the landowner's testimony about easement sales.[5] We granted review.

Like the trial court and the court of appeals, we conclude that Texas Business Organizations Code Section 2.105 grants common-carrier eminent domain authority for the construction and use of a polymer-grade propylene pipeline. Section 2.105 directly incorporates the right of eminent domain found in Texas Natural Resources Code Section 111.019(a),[6] and the evidence establishes that polymer-grade

---

[3] 605 S.W.3d 819, 829–30 (Tex. App.—Houston [1st Dist.] 2020).

[4] *Id.* at 835.

[5] *Id.* at 842.

[6] Tex. Bus. Orgs. Code § 2.105; Tex. Nat. Res. Code § 111.019(a) ("Common carriers have the right and power of eminent domain.").

3

propylene qualifies as an "oil product" derived from the refinement of either oil or natural gas liquids, both of which are components of crude petroleum. We further conclude that the company demonstrated that its pipeline serves a public use, and we reaffirm that such a determination is a legal one, not one for a jury to decide. Finally, we conclude that a property owner may testify to sales of pipeline easements across the property made to other pipeline carriers, secured through arms' length transactions, as some evidence of the current highest and best use of the property taken. Accordingly, we affirm in part, reverse in part, and remand the case to the trial court for a new trial to determine the market value of the property taken.

## I

### A

Terrance J. Hlavinka, Kenneth Hlavinka, Tres Bayou Farms, LP, and Terrance Hlavinka Cattle Company, Petitioners and Cross-Respondents, own four tracts of land in Brazoria County totaling over 13,000 acres. The land is geographically situated near the Texas Gulf Coast directly between refinery and industrial centers in Texas City and the Oyster Creek/Freeport area. Though the Hlavinkas use the land for agricultural purposes, Terrance Hlavinka, who runs the family business, testified that the family's primary purpose in acquiring it was to sell pipeline easements. The land has about twenty-five pipeline easements on it, including at least two Hlavinka negotiated with other pipeline companies in recent, arms' length transactions. Before this suit, the Hlavinkas received $3.45 million for one pipeline easement and

4

$2 million for another from other pipeline companies in private sales. The trial court excluded this testimony.

HSC Pipeline Partnership, LLC, the Respondent and Cross-Petitioner, installed its polymer-grade propylene pipeline on the Hlavinkas' property in 2017. The HSC pipeline runs adjacent to, and parallel with, two existing pipelines across tracts 2, 3, and 4 of the Hlavinkas' land. A separate series of pipeline easements follows a different route across tract 4. These easements are more or less parallel to, though distant from, HSC's pipeline. The HSC pipeline transports the propylene about forty-four miles from Texas City to its terminal point at a Braskem America plant near Oyster Creek. Braskem America, Inc. is the pipeline's only customer to date, though HSC negotiated with INEOS, another potential customer, ultimately failing to secure a contract. The pipeline has additional capacity, and it interconnects to an existing network of other pipelines in the Texas City area. It has publicly filed its tariff.

HSC owns the pipeline. It has affiliations with various Enterprise entities. Enterprise Products OLPGP, Inc., is HSC's sole managing member. Enterprise Products Operating LLC is the pipeline's operator, and it also manufactures and sells polymer-grade propylene, which HSC transports. Enterprise Products manufactures the polymer-grade propylene by obtaining refinery-grade propylene from more than forty refineries in the Texas City area.

Refinery-grade propylene is a byproduct of crude petroleum refining. Enterprise further distills refinery-grade petroleum into streams of propane and propylene. HSC's agreement with Braskem

5

provides that Braskem will purchase and pay to ship polymer-grade propylene to Braskem's facility in Oyster Creek. Braskem is not an Enterprise-affiliated entity. Braskem purchases the polymer-grade propylene from Enterprise Products before it enters HSC's pipeline.

**B**

HSC initiated condemnation proceedings after the Hlavinkas rejected HSC's offer to purchase a pipeline easement. HSC sought to condemn a total of 6.41 acres of the Hlavinkas' property for an easement 30 feet wide and about 1.8 miles long. The Hlavinkas sought dismissal of HSC's suit by filing a plea to the jurisdiction, in which they challenged HSC's power to exercise common-carrier eminent domain authority.

HSC in turn moved for partial summary judgment, seeking a legal determination as to its common-carrier status. It attached a certified copy of its T-4 permit from the Texas Railroad Commission, authorizing it to operate the pipeline. It adduced evidence that it is a common-carrier pipeline, available to all who desire to ship on the line and meet the terms of its tariff, which it provided as evidence. HSC also attached the transportation services agreement it has with Braskem, which defines polymer-grade propylene and includes testing specifications to confirm that it is a natural gas liquid transported by volume that is a minimum of 99.5% propylene and a maximum of .5% propane, with maximum parts per million of other various distillates.

HSC detailed the history of Business Organizations Code Section 2.105, and its predecessor, the Common Carrier Act, which by 1935

6

included oil products and liquefied minerals as among the products for which a common carrier could obtain pipeline condemnation authority.[7]

HSC also relied on testimony and affidavits from Roger Herrsher, an Enterprise Products employee. Herrsher described polymer-grade propylene as an "oil product[] and liquefied mineral[]", a "natural gas liquid[]," and one of "various liquified minerals and, or oil products obtained from crude petroleum and, or natural gas liquids." Natural gas liquids, he testified, are "a subset of crude petroleum" that fall "under the crude oil—crude petroleum umbrella." Natural gasoline, according to Herrsher, "is a component of NGLs [natural gas liquids] and is a component of crude oil and then, there's refined gasoline." Refiners may use "either one of those" to make "propane or the refinery grade propylene," which in turn, is further distilled to make nearly pure polymer-grade propylene.

---

[7] *See* Act of May 15, 1899, 26th Leg., R.S., ch. 117, § 1, § 4, 1899 Tex. Gen. Laws 202, 202, *reprinted in* 11 H.P.N. Gammel, *The Laws of Texas 1897-1902*, at 202, 202 (Austin, Gammel Book Co. 1902) (providing condemnation powers to corporations "for the purpose of storing, transporting, buying and selling of oil and gas, salt, brine and other mineral solutions"); Act of Apr. 27, 1935, 44th Leg., R.S., ch. 110, § 1, 1935 Tex. Gen. Laws 296, 296 (adding "liquefied minerals" to list of products the transportation of which conferred condemnation powers). The 1955 replacement of the earlier condemnation statutes with the Texas Business Corporation Act, which, like its successor Business Organizations Code Section 2.105, provided condemnation powers to any corporation "engaged as a common carrier in the pipeline business for transporting oil, oil products, gas, salt brine, fuller's earth, sand, clay, liquefied minerals or other mineral solutions," similarly cross-referenced the Natural Resources Code's predecessors, Articles 6020 and 6022 of the 1925 Revised Civil Statutes. Texas Business Corporation Act, 54th Leg., R.S., ch. 64, art. 2.01(B)(3)(b), 1955 Tex. Gen. Laws 239, 241.

The trial court granted HSC's motion for summary judgment and denied the Hlavinkas' plea to the jurisdiction. The case proceeded to a bench trial to determine the Hlavinkas' compensation for value of the land HSC had taken for the pipeline easement.

To that end, the Hlavinkas proffered Terrance Hlavinka's testimony that the highest and best use of the condemned land was for pipeline development. He recounted two recent, arms' length easement sales to other pipeline operators as evidence of the property's highest and best use before the taking. Based on these comparisons and other assumptions, he calculated a "per rod" valuation of $3.3 million.

HSC moved to exclude Hlavinka's testimony about sales of easements to other pipelines. The trial court granted HSC's motion, leaving agricultural value as the only remaining testimony as to the value of the property taken. The trial court awarded the Hlavinkas $132,293.36 in compensation, representing $108,967.36 for crop and surface damage and $23,326.00 for the easements themselves. The Hlavinkas appealed.

The court of appeals held that Business Organizations Code Section 2.105 grants condemnation authority to common-carrier pipelines that carry oil products or liquefied minerals.[8] It observed that its holding accords with the long-standing construction of Section 2.105's predecessor statute.[9] Consistent with industry terminology and related statutory definitions, it also held that polymer-grade propylene

---

[8] 605 S.W.3d at 829.

[9] *Id.* at 828.

8

constitutes an "oil product" under that section.[10] Thus, on those issues in dispute, the court of appeals affirmed the trial court.

The court of appeals reversed the trial court, however, on two other issues. Notwithstanding our Court's decision in *Denbury Green Pipeline v. Texas Rice Land Partners* ("*Texas Rice II*"), in which we held that "evidence establishing a reasonable probability that the pipeline will, at some point after construction, serve even one customer unaffiliated with the pipeline owner" satisfies the public-use requirement,[11] the court concluded that the existing contract between HSC and Braskem did not conclusively demonstrate public use.[12] The court of appeals also reversed the trial court's exclusion of Terrance Hlavinka's valuation testimony, holding that sales of easement rights granted on the same property are admissible as some evidence of the market value of the land taken at its highest and best use.[13]

Both parties sought review in this Court, and we granted both petitions. We first address the Hlavinkas' challenges to HSC's condemnation authority for this pipeline. We next address HSC's challenge to the court of appeals' holding that, on this record, public use requires a factual, rather than a legal, determination. Finally, we address whether a landowner's testimony about sales of comparable

---

[10] *Id.* at 829.

[11] 510 S.W.3d 909, 917 (Tex. 2017); *see also Tex. Rice I*, 363 S.W.3d at 202 (requiring a reasonable probability that a pipeline will serve the public by transporting product for "one or more customers who will either retain ownership of their [product] or sell it to parties other than the carrier").

[12] 605 S.W.3d at 833–35.

[13] *Id.* at 840–41.

9

easement rights on the same property is admissible to show the market value of the land taken and to rebut the presumption that the land's highest and best use before its taking was purely agricultural.

## II

The trial court granted summary judgment to HSC, ruling that it is a common carrier that has condemnation power under Texas Business Organizations Code Section 2.105. The court of appeals affirmed this ruling. The Hlavinkas argue that polymer-grade propylene is not a product identified in either Section 111.002 of the Natural Resources Code or Section 2.105 of the Business Organizations Code, which is necessary to qualify HSC as a common carrier with eminent domain authority for this particular pipeline. Alternatively, even if polymer-grade propylene qualifies as an "oil product" or a "liquefied mineral" under Section 2.105 of the Business Organizations Code, the Hlavinkas argue, then its listing in that section does not independently confer eminent domain authority. Rather, such authority must be found in Section 111.002 of the Natural Resources Code. In that section, neither "oil product" nor "liquefied mineral" is separately listed from "crude petroleum" as a product for transport for which a pipeline company has condemnation authority.

We review a trial court's summary judgment and its interpretation of statutory language de novo.[14] We enforce a statute "as written,"[15] and "avoid construing individual provisions of a statute in

---

[14] *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015).

[15] *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009).

10

isolation from the statute as a whole."[16]  We give effect to all included words without treating any language as surplusage, if possible.[17]  As the movant, HSC must prove that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.[18]

## A

The Legislature has cultivated two sources of condemnation authority for pipelines, one in Business Organizations Code Section 2.105, and the other in Natural Resources Code Chapter 111.  The Hlavinkas argue that any entity claiming common-carrier status through Business Organizations Code Section 2.105 must first qualify as a common carrier under Natural Resources Code Section 111.002, which identifies different products for pipeline transportation than the products Section 2.105 identifies.[19]  Section 111.002 does not purport to be an exclusive list of common-carrier pipeline products, but the

---

[16] *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011).

[17] *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000).

[18] *Tex. Rice II*, 510 S.W.3d at 914.

[19] *Compare* Tex. Nat. Res. Code § 111.002 (qualifying pipeline owners or managers as common carriers when pipeline transports crude petroleum, coal, carbon dioxide, hydrogen, or feedstock for carbon gasification and carbon gasification's products and derivatives), *with* Tex. Bus. Orgs. Code § 2.105 (conferring "rights and powers" on common-carrier "entities engaged . . . in the pipeline business for the purpose of transporting oil, oil products, gas, carbon dioxide, salt brine, fuller's earth, sand, clay, liquefied minerals, or other mineral solutions").  HSC argues that its pipeline qualifies under either statute.  Because we conclude "oil products" in Section 2.105 grants condemnation authority to pipelines that transport such products, and that polymer-grade propylene is such a product, we do not address whether it also falls within Section 111.002's listed products.

11

Hlavinkas nonetheless argue that Section 2.105 is essentially subordinate to Section 111.002 when it comes to condemnation authority, rather than an independent grant of that authority for the pipeline-transportation products Section 2.105 identifies.

Section 2.105, however, does not refer to Section 111.002. Instead, Section 2.105 explicitly expands condemnation authority to pipeline entities engaged as common carriers for the transport of products beyond those included in Section 111.002. It does so by incorporating Sections 111.019 through 111.022 from Chapter 111, without reference to Section 111.002:

> . . . [E]ntities engaged as a common carrier in the pipeline business for the purpose of transporting oil, oil products, gas, carbon dioxide, salt brine, fuller's earth, sand, clay, liquefied minerals, or other mineral solutions *ha[ve] all the rights and powers conferred on a common carrier by Sections 111.019–111.022, Natural Resources Code.*[20]

Section 111.019 grants eminent domain power to common-carrier pipelines. Because Section 111.002 and Section 2.105 separately incorporate its provisions, they provide alternative paths to obtaining that power.[21]

To limit common-carrier status for pipeline companies claiming it under Section 2.105 to only those that transport the products listed in

---

[20] Tex. Bus. Orgs. Code § 2.105 (emphasis added).

[21] Tex. Nat. Res. Code § 111.019 ("(a) Common carriers have the right and power of eminent domain. (b) In the exercise of the power of eminent domain granted under the provisions of Subsection (a) of this section, a common carrier may enter on and condemn the land, rights-of-way, easements, and property of any person or corporation necessary for the construction, maintenance, or operation of the common carrier pipeline.").

Natural Resources Code Section 111.002 imposes a statutory constraint that the Legislature did not. Such a reading deprives Section 2.105 of its effect for those products it explicitly identifies but that are not listed in Section 111.002.[22] Recognizing as much, courts have long interpreted Section 2.015 and its predecessor statutes[23] to be an independent grant of condemnation authority.[24]

We hold that Business Organizations Code Section 2.105 confers the condemnation "rights and powers" found in Natural Resources Code Sections 111.019 through 111.022 for those common-carrier pipelines that transport the products that Section 2.105 identifies.

**B**

Given that Section 2.105 grants condemnation authority for common-carrier pipelines that transport the products it identifies, the Hlavinkas next argue that HSC has failed to establish that polymer-grade propylene is an "oil product" identified within Section 2.105. Section 2.105 does not define "oil product." The Natural Resources Code,

---

[22] *See Spradlin*, 34 S.W.3d at 580 (quoting *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987)) (rejecting statutory interpretation that would render provision superfluous).

[23] *See infra* note 8 (describing predecessor versions).

[24] *See, e.g.*, *Harris County v. Tenn. Prods. Pipe Line Co.*, 332 S.W.2d 777, 780 (Tex. App.—Houston 1960, no writ) (holding that, "under Article 2.01 of the Texas Business Corporations Act, [appellees] have the right as common carriers in the pipe line business transporting oil products, to lay their pipes"); *see also ExxonMobil Pipeline Co. v. Bell*, 84 S.W.3d 800, 803–04 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("ExxonMobil, as a common carrier, is accorded the power of eminent domain. *See* Tex. Bus. Corp. Act Ann. art. 2.01(B)(3)(b).").

13

however, defines "oil" as "crude petroleum oil,"[25] and "petroleum product" to include "any other liquid petroleum product or byproduct derived from crude petroleum oil."[26] Further, the Railroad Commission defines "product" to include "refined crude oil, . . . processed crude petroleum, residue from crude petroleum, . . . blends or mixtures of petroleum, and/or any and all liquid products or by-products derived from crude petroleum oil or gas, whether hereinabove enumerated or not."[27]

HSC adduced summary-judgment evidence that polymer-grade propylene is an "oil product," as it can be derived as a byproduct of crude oil.[28] The Hlavinkas challenge this evidence by pointing to the various ways that Herrsher described it. They also argue that an "oil product" must be naturally occurring, and, as a byproduct of refined petroleum, polymer-grade propylene is not.

---

[25] Tex. Nat. Res. Code § 115.001(5).

[26] *Id.* § 115.001(7)(X).

[27] 16 Tex. Admin. Code § 3.79(21). Section 2.105 does not define "oil product," but words "that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code § 311.011(b). Further, we reject the Hlavinkas' argument that the Texas Railroad Commission lacks regulatory jurisdiction over Section 2.105 pipelines. *See* Tex. Nat. Res. Code § 81.051(a)(3) (giving the Railroad Commission jurisdiction over *all* "persons owning or operating pipelines in Texas").

[28] The Hlavinkas challenged the admission of Herrsher's affidavits, which include some evidence that polymer-grade propylene also qualifies as a liquefied mineral. HSC argued, and the court of appeals agreed, that the Hlavinkas had waived their objections to those affidavits. We do not reach the court of appeals' waiver ruling because we conclude that other evidence in HSC's motion for partial summary judgment establishes polymer-grade propylene qualifies as an oil product for Section 2.105 purposes.

The summary-judgment evidence demonstrates that polymer-grade propylene is a derivative of crude petroleum. Refiners make polymer-grade propylene by further distilling refinery-grade propylene into streams of propane and propylene using a catalytic process. Refinery-grade propylene is in turn derived from propane and natural gas liquids, which are components of crude petroleum.[29] Enterprise collects this refinery-grade propylene from more than forty area refineries that refine crude oil before Enterprise further refines it into polymer-grade propylene. Because the Natural Resources Code defines oil as "crude petroleum oil," and polymer-grade propylene is a product derived from crude oil's refinement and distillation, we conclude that it qualifies as an "oil product" under Business Organizations Code Section 2.105. This interpretation also aligns with the Railroad Commission's definition of "product" to include "all liquid products or by-products derived from crude petroleum oil or gas."[30]

---

[29] Natural gas liquids are liquid hydrocarbons that fall under the umbrella of crude petroleum. U.S. Energy Information Administration, *Hydrocarbon gas liquids explained: Where do hydrocarbon gas liquids come from? Basics*, https://www.eia.gov/energyexplained/hydrocarbon-gas-liquids/where-do-hydrocarbon-gas-liquids-come-from-in-depth.php (Oct. 26, 2021); *see also* U.S. Dep't of Energy, *Natural Gas Liquids Primer*, 5 (2018), https://www.energy.gov/sites/prod/files/2018/07/f54/NGL_Primer.pdf (categorizing propane as a natural gas liquid and stating that "NGLs are hydrocarbons—in the same family of molecules as natural gas and crude oil, composed exclusively of carbon and hydrogen").

[30] 16 Tex. Admin. Code § 3.79(21); *see also Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 789 (Tex. Comm'n App. 1928, holding approved) ("Crude oils or petroleums are mixtures of bituminous hydrocarbons, some of which are solids, some are liquids, and some are gases, the solids and gases being soluble in the liquids. A crude oil may consist of these various hydrocarbons in almost any proportions, its physical properties varying

The Hlavinkas do not challenge HSC's evidence about the nature of polymer-grade propylene, but instead point out inconsistencies in Herrsher's testimony describing polymer-grade propylene and its sources. Herrsher testified that propylene is produced from propane, and propane is a "'component of crude petroleum," which places polymer-grade propylene "under the umbrella" of crude petroleum. He also testified that refinery-grade propylene can be made from either crude oil or refined gasoline. Because polymer-grade propylene can be derived from crude petroleum, however, it qualifies as an oil product under Section 2.105.

We hold that HSC has established that polymer-grade propylene is an oil product. Accordingly, we affirm the trial court and court of appeals rulings that Section 2.105 confers to HSC condemnation authority to build and construct a common-carrier pipeline to transport it.

## C

The final question about HSC's condemnation authority is whether its pipeline serves a public use. Public use is a constitutional requirement that a pipeline common carrier must fulfill to exercise eminent-domain authority. Section 2.105 incorporates this element by requiring that a pipeline transporter be "engaged as a common

---

accordingly." (quoting J.O. Lewis, Bureau of Mines, U.S. Dep't of Interior, Bulletin 148, Methods for Increasing the Recovery from Oil Sands 11 (1917))).

carrier."[31] This standard prevents the misuse of eminent domain for purely private purposes.

In the *Texas Rice* cases, our Court established the test for determining public use in this context: a pipeline serves a public use as a matter of law if it is reasonably probable that, in the future, the pipeline will "serve even one customer unaffiliated with the pipeline owner."[32] The Hlavinkas argue that there should be an additional requirement: the manufacturer of the transported product must also have no affiliation with the pipeline owner. The court of appeals concluded that a jury must resolve such a question.[33]

In *Texas Rice I*, landowners challenged a pipeline company's condemnation authority when it sought to build a pipeline to connect its out-of-state carbon dioxide reserves to its Texas oil wells.[34] We observed that for a company "[t]o qualify as a common carrier with the power of eminent domain, the pipeline must serve the public; it cannot be built only for the builder's exclusive use."[35] A pipeline built to transport a

---

[31] Tex. Bus. Orgs. Code § 2.105. Common carriers are individuals or entities that hold themselves out to the public for hire in the business of transporting passengers or goods. *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 361 (Tex. 2020). A statute cannot abridge constitutional protections, which apply whether a pipeline derives its eminent-domain power from either Section 111.002 or Section 2.105.

[32] *Tex. Rice II*, 510 S.W.3d at 917; *accord Tex. Rice I*, 363 S.W.3d at 200–02.

[33] 605 S.W.3d at 834–35.

[34] 363 S.W.3d at 195–96.

[35] *Id.* at 200.

company's product from one of its own sites to another it also owns is not a public use.[36]

We later held in *Texas Rice II* that transportation contracts between the pipeline company and an unaffiliated entity for future pipeline transport establish a public use.[37] One contract in that case did not establish a public use because the pipeline company regained title to the transported product after transporting it.[38] But another contract with an unaffiliated customer established a reasonable probability that the pipeline would serve the public.[39]

HSC's contract with Braskem proves that the HSC pipeline serves "even one customer unaffiliated with the pipeline owner."[40] Accordingly, it meets the *Texas Rice* public use standard. It is an existing transportation contract with an unaffiliated customer, and the pipeline connects to existing pipeline networks, making the transportation network feasible. The pipeline has additional capacity and terminates near other potential customers. HSC has publicly filed a tariff with the Railroad Commission demonstrating that it offers and markets the pipeline for public hire.

The Hlavinkas argue that we should enlarge the conditions expressed in *Texas Rice I* and limit pipelines for public use to those that carry products for which a pipeline or its affiliate never possess an

---

[36] *Id.*

[37] 510 S.W.3d at 917.

[38] *Id.* at 916–17.

[39] *Id.*

[40] *Id.* at 917.

ownership interest.  Though they acknowledge that Braskem takes title to the polymer-grade propylene before it enters the HSC pipeline, they argue that Braskem could just as easily have taken title at the other end.[41]

As in *Texas Rice II*, however, the HSC pipeline serves at least one unaffiliated customer, satisfying the test we laid out in *Texas Rice I*, which facilitates the public transportation of pipeline products for use in industry and commerce.  Requiring that transported goods be sold and delivered to a non-affiliate ensures that the pipeline is not private; it instead is open to non-affiliate customers.  Unlike the contract found insufficient in *Texas Rice II*, title to the Braskem product does not revert to either HSC or to any of its affiliates.[42]

The court of appeals erred in suggesting that, notwithstanding the absence of any disputed issues of fact, a jury must resolve the question of whether HSC's pipeline serves a public use.[43]  This would inject substantial uncertainty into multi-parcel infrastructure development, risking inconsistent adjudications among multiple triers of fact.  Recognizing as much, our Court has reiterated through the

---

[41] *See id.* at 916–17; *see also Crosstex NGL Pipeline, L.P. v. Reins Rd. Farms-1, Ltd.*, 404 S.W.3d 754, 761–62 (Tex. App.—Beaumont 2013, no pet.) (holding no public use when a pipeline company took title of a product before it entered the pipeline).

[42] *See Tex. Rice I*, 363 S.W.3d at 200 ("The term 'for the public for hire' implies that the gas is being carried for another who retains ownership of the gas, and that the pipeline is merely a transportation conduit rather than the point where title is transferred.").

[43] 605 S.W.3d at 835.

19

decades that "the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts."[44]

We hold that the HSC pipeline serves at least one unaffiliated customer, and thus HSC established that the pipeline serves a public use.[45]

III

A

Having concluded that HSC possesses the authority to condemn an easement for a polymer-grade propylene pipeline, we address its challenge to the court of appeals' holding that Terrance Hlavinka's testimony about sales to secure other easements on the property is admissible to show the market value of the land taken. The trial court excluded this testimony. We review the trial court's decision to exclude testimony for abuse of discretion.[46]

To value condemned land for the purpose of compensating the landowner, one generally measures the difference in the market value of the land immediately before and immediately after the taking.[47] And, "[i]n measuring the landowner's compensation for condemned property,

---

[44] *Maher v. Lasater*, 354 S.W.2d 923, 925 (Tex. 1962); *Tex. Rice II*, 510 S.W.3d at 914.

[45] *Tex. Rice II*, 510 S.W.3d at 917. Our holding today accords with *Texas Rice II*, in which the contract held to be evidence of public use involved a product sale from an entity affiliated with the pipeline owner to an unaffiliated customer. *Id.* at 916–17.

[46] *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012).

[47] *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002).

'the question is, what has the owner lost, not what has the taker gained.'"[48]  A factfinder should consider the highest and best use of the land in determining the market value of the property taken.[49]  The existing use of the land is presumed to be its highest and best use, "but the landowner can rebut this presumption by showing a reasonable probability that when the taking occurred, the property was adaptable and needed or would likely be needed in the near future for another use."[50]

A property owner may testify about the market value of the property taken.[51]  The owner's testimony must be based on facts that demonstrate the property's market value, "rather than intrinsic or some other speculative value of the property."[52]  "Market value is 'the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it.'"[53]  Arms' length transactions are appropriate

---

[48] *Avinger Timber*, 386 S.W.3d at 262 (quoting *Bost. Chamber of Com. v. City of Boston,* 217 U.S. 189, 195 (1910)).

[49] *Id.* at 261.

[50] *Zwahr*, 88 S.W.3d at 628.

[51] *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012).

[52] *Id.*; *see also Porras v. Craig*, 675 S.W.2d 503, 505 (Tex. 1984) (holding that landowner's testimony provided no evidence of market value because decrease in value was based on landowner's subjective valuation of the property), abrogated on other grounds by *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.) L.P.*, 449 S.W.3d 474 (Tex. 2014).

[53] *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) (quoting *State v. Carpenter*, 89 S.W. 194, 202 (Tex. [Comm'n Op.] 1936)).

evidence of market value, provided the sales are voluntary, contemporary, local, and "involve land with similar characteristics."[54] Finally, the "project enhancement rule" in condemnation law disallows the inclusion of any increase in market value attributable to the project itself.[55]

**B**

In his offer of proof, Terrance Hlavinka testified that the Hlavinkas purchased the property for the express purpose of pipeline development. He delineated the property's unique geographic characteristics that make it particularly suitable for pipeline development. It is situated directly between two substantial industrial and refining hubs. The Gulf of Mexico to the south limits the feasibility of pipeline development in that direction. At least one pipeline ran across the property at the time the family purchased it. By the time of trial, "closer to 25" pipelines traversed the property. Hlavinka had privately negotiated with other pipeline companies for two pipeline easements across this property in the two years immediately before the condemnation. He sought to introduce evidence of these transactions (with some adjustments) as comparable uses as part of establishing the value of the property taken.

---

[54] *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001).

[55] *Zwahr*, 88 S.W.3d at 627–28 (observing that because the judicial objective in the context of condemnation is to "make the landowner whole," the factfinder may not consider, in determining market value, any enhancement to property value resulting from the property's condemnation).

In seeking to exclude this testimony, HSC submitted that the Hlavinkas' current use of the proposed easement was for agriculture, and thus it must be presumed that agriculture is the condemned property's highest and best use.[56]

A landowner, however, may rebut the presumption that the current use is the highest and best use of the land taken.[57] Arms' length sales to the other pipeline companies that were voluntary, contemporary, local, and involve land with similar characteristics are some evidence demonstrating that the highest and best use of the property was as a pipeline easement. That is, Terrance Hlavinka's testimony is some evidence that the easement that HSC condemned could have been granted to another pipeline at a significantly higher price than its agricultural value.

Relying on *Exxon Pipeline Co. v. Zwahr*, HSC argues that Terrance's valuation testimony impermissibly considers enhancement to the land resulting from the pipeline itself, which violates the project-enhancement rule.[58] Hlavinka's testimony, however, is not that

---

[56] *Avinger Timber*, 386 S.W.3d at 261 ("There is a presumption that the highest and best use of the land is the existing use of the land.").

[57] *Zwahr*, 88 S.W.3d at 628.

[58] *See id.* at 627. In *Zwahr*, Exxon sought to condemn a tract already substantially encumbered with an existing 50-foot-wide easement. *Id.* at 625–26. The landowners adduced expert testimony that the easement was "a self-contained, separate economic unit, which had a value independent from that of the surface acreage, with a highest and best use as a pipeline easement." *Id.* at 626. Our Court held that the trial court erred in admitting this testimony because the expert relied on the Exxon condemnation itself to establish the property's value. *Id.* at 628. As we explained, "had the Exxon project never come along, the .82 acres would have continued to have no value to the

the easement is valuable due to HSC's interest; rather, it is valuable because purchasers other than HSC also value the easement's geographic qualities—its location between industrial areas and the unsuitability of the land to the north and the south. Such a valuation is not based on value HSC created by its interest, but instead is based on the value of the easement were the Hlavinkas to sell it to another ready and willing market participant. The multitude of pipelines crossing the tract, including those parallel and adjacent to HSC's pipeline—and the prices paid to secure those easements—is some evidence that the land is valuable to other pipeline carriers for its intrinsic qualities, notwithstanding HSC's decision to condemn it.

The impact of HSC's taking was the loss of the ability to sell the tract to a different pipeline, which distinguishes this case from the court of appeals' decision in *Enbridge G & P v. Samford*.[59] The expert in *Samford* testified that the "going rate" for pipeline easements was $850, supported by no evidence of sales.[60] Nor was there any indication that the landowners in *Samford* had opportunities to sell the land to other pipeline companies and successfully had done so.

---

[landowners]. [The expert] provided no explanation, other than the Exxon project itself, to explain the increase in the value of the .82–acre covering the [existing] easement from zero to $35,720 an acre. Moreover, he admitted twice that the value he placed on the land did not exist before Exxon's condemnation." *Id.* at 630. The Hlavinkas, in contrast, adduced evidence that HSC's easement had value to the Hlavinkas because they could encumber it in a fair market transaction to another pipeline company. The value existed before and apart from HSC's pipeline.

[59] 470 S.W.3d 848, 862 (Tex. App.—Tyler 2015, no pet.).

[60] *Id.* at 856, 861–62.

24

In the ordinary condemnation case, there is no credible evidence to suggest that, if the land had not been condemned, a pipeline easement could be sold to another. This is no ordinary condemnation case. Sales of easements on this property to other pipeline companies, combined with the existence of pipelines running parallel and adjacent to HSC's pipeline, provide some evidence from which a factfinder reasonably could conclude that the Hlavinkas could have sold to another the easement that they instead were compelled to sell to HSC.

HSC further challenges some of Hlavinka's assumptions as speculative, as well as his "per rod" calculation of value.[61] We do not address these remaining valuation challenges, other than to simply note that no valuation assumption may be speculative. The foundation of Hlavinka's valuation testimony was the excluded evidence of comparable arms' length easement sales on this property. Because exclusion of this testimony denied the landowners their opportunity to rebut the presumption that the land's highest and best use was purely agricultural, we conclude that the trial court's error was harmful, warranting a new trial as to market value.[62] On remand, HSC is free to challenge any valuation assumption, and the factfinder is free to adjust the market valuation based on all the admissible evidence.[63]

---

[61] *See id.* at 859–61; *see also Exxon Pipeline Co. v. Hill*, 788 So. 2d 1154, 1164 (La. 2001) ("Rods standing alone fail to consider many important attributes which insure proper valuation of land.").

[62] *See Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 145 (Tex. 2016) (holding that error in excluding admissible, non-cumulative evidence to determine market value of the property taken is harmful).

[63] *Estate of Sharboneau*, 48 S.W.3d at 182.

This is not to say that land that a pipeline traverses either instantly or always becomes a "pipeline corridor" with a corresponding rise in market value. A landowner must show a "reasonable probability" that the land would "likely be needed in the near future for another use"[64]—that is, to sell to another interested market participant. A single or ancient pipeline may not be sufficient to show market value because, standing alone, it may not indicate that a current market for the easement exists absent the taking. The evidence in this case, in contrast, of frequent, recent, comparable sales, should have been admitted to show a "reasonable probability" that the easement condemned by HSC would likely have been sold to another pipeline in the near future. The factfinder, as always, is free to disbelieve that evidence or reject the notion that this easement presents such a case.

A condemnation should not be a windfall for a landowner.[65] Nor should it be a windfall for a private condemnor. A condemnor must pay a fair price for the value of the land taken.[66] Evidence of recent fair market sales to secure easements running across the property that precede the taking are admissible to establish the property's highest and best use, and its market value, at the time of the taking.

*      *      *

For these reasons, we affirm in part and reverse in part the judgment of the court of appeals. We remand the case to the trial court

---

[64] *Zwahr*, 88 S.W.3d at 628.

[65] *Id.*

[66] *Estate of Sharboneau*, 48 S.W.3d at 183.

26

for a determination of the fair market value of the property at the time it was taken.

---

Jane N. Bland
Justice

**OPINION DELIVERED:** May 27, 2022